# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

Case No. 16-cv-02763-BLF

PAUL PONOMARENKO,

Plaintiff,

v.

NATHAN SHAPIRO, et al.,

Defendants.

**ORDER GRANTING IN PART WITH
LEAVE TO AMEND AND DENYING IN
PART PLAINTIFF AND THIRD PARTY
DEFENDANT'S MOTION TO DISMISS
DEFENDANT SHAPIRO'S
COUNTERCLAIMS AND THIRD
PARTY COMPLAINT; GRANTING
SHAPIRO'S MOTION TO CHANGE
VENUE; TRANSFERRING CASE TO
DISTRICT OF NEVADA**

[Re: ECF 59, 74]

Plaintiff Paul Ponomarenko ("Ponomarenko") brings this action against Defendants
Nathan Shapiro ("Shapiro") and Project Vegas Mansion ("PVM") (collectively, "Defendants") for
alleged breach of contract and fraud arising out of a contract for personal coaching services with
PVM—services that Ponomarenko alleges were never provided to him. *See generally* First
Amended Complaint ("FAC"), ECF 43. Shapiro, proceeding *pro se*, filed seven counterclaims
against Ponomarenko as well as a Third Party Complaint against Ponomarenko's company,
Summit Estate, Inc. ("Summit Estate").[1] *See* Answer, Counterclaim and Third Party Complaint
("Answer & Counterclaim"), ECF 56.

Ponomarenko and Summit Estate filed a joint motion to dismiss the Counterclaim and
Third Party Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Motion to
Dismiss ("MTD"), ECF 59. In addition to opposing the motion to dismiss, Shapiro filed a motion
to change venue to the United States District Court for the District of Nevada, unofficial southern

---

[1] As discussed below, Shapiro's Third Party Complaint against Summit Estate does not include
any causes of action. *See* ECF 56 at 30-31. Rather, Shapiro's theory is that Summit Estate acted
as the alter ego of Ponomarenko.

division seated in Las Vegas, Clark County, pursuant to 28 U.S.C. § 1404(a) and the forum selection clause in the written agreement between the parties. *See* Motion to Change Venue ("Transfer Mot."), ECF 74.

The Court heard oral argument on both motions on December 7, 2017. At the hearing, the Court explained to the parties that it would rule on Ponomarenko and Summit Estate's motion to dismiss the counterclaim and third party complaint regardless of whether it ultimately transferred the case to Nevada pursuant to the forum selection clause. For the reasons that follow as well as those stated on the record at the hearing, Ponomarenko and Summit Estate's motion to dismiss the Counterclaim and Third Party Complaint is GRANTED IN PART WITH LEAVE TO AMEND and DENIED IN PART.

Moreover, upon consideration of the briefing, oral argument, and relevant law, Shapiro's motion to change venue is GRANTED. This action shall be transferred to the United States District Court for the District of Nevada, unofficial southern division seated in Las Vegas, Clark County, Nevada. Any amendments to Shapiro's Counterclaim and Third Party Complaint are due on or before **March 7, 2018.**

## I.      BACKGROUND

### A.      Allegations in the FAC[2]

Ponomarenko alleges that Shapiro is a life coach who markets his coaching services to potential clients in California such as Ponomarenko. *See* FAC ¶ 11. Shapiro regularly collaborated with other life coaches to promote his services in major cities in the United States including New York, Las Vegas, Miami, San Francisco, Chicago, and others. *Id*. ¶¶ 11-12. Shapiro is the sole owner and operator of Project Vegas Mansion ("PVM"), which offered these personal coaching sessions through PVM agents. *Id*. ¶¶ 3, 8. Ponomarenko met Shapiro at a PVM personal coaching seminar in San Francisco in February 2013. *Id*. ¶¶ 14-16. Ponomarenko paid $349 to attend the event. *Id*. ¶ 15.

---

[2] The following facts are taken from Ponomarenko's FAC and are provided for context for the motion to transfer. Allegations in the FAC are not taken as true for the Court's determination of Ponomarenko's motion to dismiss Shapiro's Counterclaim and Third Party Complaint.

1    Ponomarenko later attended an "in-field" coaching session, where Defendants took him

2    and several other individuals on "training sessions." *Id*. ¶ 16.  Following the seminar and training

3    sessions, Defendants invited Ponomarenko to join them at a third event for further demonstration

4    of their personal coaching methods. *Id*. ¶ 17.  After these interactions, Shapiro allegedly induced

5    Ponomarenko to consider a long-term business relationship with Defendants for personal coaching

6    services which would include "substantial, regular, and organized feedback." *Id*. ¶¶ 18-19.  Shapiro

7    informed Ponomarenko that the personal coaching services would be provided in both California

8    and Nevada, and would require Ponomarenko to "periodically travel" to Nevada to receive

9    coaching.  *Id*. ¶ 19.  The coaching sessions would be provided under the PVM "umbrella" through

10   PVM's agents including Shapiro and another individual who identified himself to be working on

11   behalf of PVM as Shapiro's business partner.  *Id*.  Thereafter, Ponomarenko flew to Las Vegas,

12   Nevada, where he visited PVM's "coaching center" and finalized a written agreement with PVM

13   for long term personal coaching. *Id*. ¶¶ 20-21.

14   While in Las Vegas, Ponomarenko and Defendants executed a written agreement whereby

15   PVM would provide a specific number of hours and sessions of personal coaching to

16   Ponomarenko in exchange for payment.  *Id*. ¶ 21; *see also* Project Vegas Mansion's Agreement,

17   ECF 74-1 ("First Agreement").  The First Agreement was executed in writing on March 3, 2013,

18   and obligated Ponomarenko to make an initial down payment of $25,000.  FAC ¶ 21; First

19   Agreement at 16.  Ponomarenko paid Shapiro $5,000 while he was in Las Vegas, and paid an

20   additional $15,000 a few days later.  FAC ¶ 21.  Upon execution of the First Agreement,

21   Ponomarenko also paid $5,000 to another individual named Luke Krogh ("Krogh"). [3]  The

22   remainder of the payments owed under the First Agreement were to be made in regular intervals

23   during the course of the training period.  *Id*.

24   The First Agreement expressly stated that Ponomarenko would receive his training from

25

26   [3] The FAC does not explicitly name Krogh, but instead refers to him as "the colleague and
     purported business partner of Defendant Shapiro" or "PVM's agent." *See e.g.* FAC ¶¶ 26-28.
27   However, Shapiro alleges Krogh's identity in his Answer and Counterclaims, and the parties
     explicitly discussed Krogh's role in events at the hearing on the pending motions.  As such, and
28   for purposes of clarity, the Court refers to Krogh by his name in this Order.

Krogh. *See* FAC ¶ 22; First Agreement at 16. Krogh became Ponomarenko's "personal mentor and instructor," and Ponomarenko alleges that he was told to make his remaining payments due under the First Agreement to Krogh. FAC ¶ 22. In the time period from March 2013 to January 2014, Ponomarenko repeatedly and regularly traveled between California and Nevada to attend the contracted coaching sessions. FAC ¶ 23. Ponomarenko alleges that it became evident that the personal coaching sessions lacked the "clearly defined structure" he was promised, and many sessions were conducted "in a party like setting," at Ponomarenko's expense. *Id*. ¶ 24. Ponomarenko grew frustrated with the lack of organized training, which he communicated to Krogh. *Id*. ¶ 25.

In January 2014, Krogh proposed a second agreement to Ponomarenko whereby Krogh would move to San Francisco to provide the coaching sessions so that Ponomarenko did not have to regularly fly to Las Vegas. *Id*. ¶ 26 (hereafter, "Second Agreement"). Ponomarenko was given the impression that PVM authorized the Second Agreement, although Ponomarenko did not communicate with Shapiro during this time period. *Id*.[4] Pursuant to the Second Agreement, which was in oral form only, Ponomarenko agreed to pay $99,000 to enroll in an advanced personal coaching program. *Id*. In addition to the fees, Ponomarenko agreed to cover all of Krogh's travel expenses for the duration of the Second Agreement. *Id*.

In February 2014, Krogh traveled to San Francisco and stayed in a short-term rental apartment—paid for by Ponomarenko—for a purported coaching session that lasted approximately 7 days. *Id*. ¶ 27. On February 20, 2014, Krogh required Ponomarenko to pay $40,000, consisting of a $23,500 payment on the First Agreement and a $16,500 down payment for the Second Agreement. Id. ¶ 28. Ponomarenko made these payments to Krogh, and alleges that he was shocked when Shapiro contacted Ponomarenko in January 2016 to inform him that a $23,500 payment was still owed to PVM. *Id*. Krogh never delivered on the promise to provide advanced coaching services to Ponomarenko. *Id*. ¶ 29. Much like the First Agreement, it appeared that Ponomarenko's payments were instead used to fund "a lavish San Francisco/Vegas lifestyle" for

---

[4] The Court notes that Shapiro denies any involvement in the Second Agreement. *See* Answer & Counterclaim ¶ 29.

PVM's agents, and to solicit other clients and business with no benefit to Ponomarenko. *Id.*

Ponomarenko terminated the Second Agreement in November 2014, yet Krogh demanded the full amount of the coaching fee as well as additional expenses. *Id.* ¶ 30. When Krogh finally left the apartment, Ponomarenko had to pay additional expenses to terminate the lease. *Id.* Ponomarenko alleges that he paid thousands of dollars to PVM and its agents, including Shapiro, for coaching services that were never provided to him as promised. *Id.* ¶¶ 31-43.

Ponomarenko filed this suit against Shapiro and PVM on May 23, 2016. *See generally* Complaint, ECF 1. Shapiro moved to quash service of process for failure to serve in accordance with the Federal Rules of Civil Procedure, and moved to dismiss the complaint for lack of personal jurisdiction over him. *See* ECF 27. On May 3, 2017, the Court denied Shapiro's motion to quash service of process, and granted the motion to dismiss for lack of personal jurisdiction with leave to amend in order to allege Shapiro's contacts with California, an agency relationship between Shapiro and PVM or "PVM's agent," (Krogh), and/or that PVM has no corporate identity separate from Shapiro. *See* ECF 42 at 11.[5]

On May 30, 2017, Ponomarenko filed the FAC asserting six claims against Shapiro and PVM for (1) breach of contract; (2) intentional misrepresentation; (3) negligent misrepresentation; (4) false promise; (5) breach of the covenant of good faith and fair dealing; and (6) violation of California's Unfair Competition Law, California Business and Professions Code § 17200 ("UCL"). *See generally* FAC.

**B.      Allegations in Shapiro's Counterclaim and Third Party Complaint[6]**

Shapiro answered the FAC on June 30, 2017, asserting venue in the United States District Court of Nevada seated in Clark County, Las Vegas, Nevada. *See* Answer & Counterclaim ¶ 5 at 19, 31. Shapiro brought a Counterclaim against Ponomarenko, asserting seven causes of action. *Id.* at 24-30. In addition, Shapiro brought a Third Party Complaint against Summit Estate, that

---

[5] As the Court noted in its prior order, there is no evidence that PVM is not a corporate entity. *See* ECF 42 at 1 n.1. Because a corporation cannot be represented *pro se*, the Court construes the relevant counterclaims and motions filed by Shapiro to be on behalf of Shapiro alone. *In re Bigelow*, 179 F.3d 1164, 1165 (9th Cir. 1999).
[6] The following facts are taken from Shapiro's Answer, Counterclaim, and Third Party Complaint and are accepted as true on a motion to dismiss. *See* ECF 56.

does not include any causes of action but asserts that Ponomarenko and Summit Estate acted for each other in connection with the challenged conduct "as agents of each other" and therefore each is fully liable for the acts of the other. *Id*. at 32-33. Among other relief, Shapiro seeks general damages in the amount of $2,423,000 against Ponomarenko and Summit Estate. *Id*. at 33.

Shapiro alleges that through PVM, he invested considerable resources to develop his personal coaching business in the Las Vegas metropolitan area. *Id*. at 19-20. This included identifying clients and techniques, maintaining relationships with those clients, developing innovative solutions to meet client needs, and developing highly qualified personal coaches to benefit the clients. *Id*. at 20. Shapiro alleges that this information is "valuable, confidential, and proprietary" and has "significant economic value." *Id*.

The First Agreement between Ponomarenko and PVM, executed in March 2013, contains covenants not to compete and not to divulge confidential information. *Id*. at 21. For example, the First Agreement's non-compete clause provides in part that "[d]uring coaching and after leaving the PVM program PARTICIPANT will not compete with PVM for a period of two years within Clark County, Nevada." First Agreement at 10. The First Agreement also contains a non-disclosure provision, which governs the use of confidential information. *Id*. at 10-11.

Shapiro alleges that Ponomarenko and Summit Estate violated these provisions in the First Agreement by forming a business entity known as "Elevated Pickup" for the purposes of competing with PVM. *Id*. at 22. Elevated Pickup offers social relationship coaching in Las Vegas as well as Los Angeles and San Francisco. *Id*. at 22-23. In essence, Shapiro's allegation is that while Ponomarenko was still working with PVM, he contacted PVM's clients, disclosed PVM's proprietary and confidential information, contacted PVM's key independent contractor for his own benefit, and solicited business and clients for Elevated Pickup, all in contravention of the First Agreement. *Id*. at 23. For example, Shapiro alleges that Ponomarenko communicated with at least 100 PVM potential or current clients using electronic networking systems such as meetup.com, Craigslist, and Twitter, in an attempt to secure business for Elevated Pickup. *Id*.

In his Counterclaim, Shapiro asserts seven causes of action against Ponomarenko for: (1) breach of contract; (2) breach of non-disclosure and confidentiality provisions; (3) breach of

non-compete provision; (4) tortious interference with prospective economic advantage; (5) breach of Nevada Uniform Deceptive Trade Practices Act; (6) civil conspiracy; and (7) breach of implied covenant of good faith and fair dealing. *Id*. at 18-30. Although Shapiro asserts a "Third Party Complaint" against Summit Estate, it contains no causes of action. *Id*. at 30-31. Ponomarenko and Summit Estate filed a joint motion to dismiss the Counterclaim and Third Party Complaint. *See generally* MTD. The Court first addresses the motion to dismiss, and then turns to Shapiro's motion to change venue pursuant to the forum selection clause in the First Agreement.

## II. MOTION TO DISMISS COUNTERCLAIM AND THIRD PARTY COMPLAINT

### A. Rule 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986). However, under the "incorporation by reference" doctrine, the Court also may consider documents which are referenced extensively in the complaint and which are accepted by all parties as

authentic. *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

If the Court concludes that the complaint should be dismissed, it must then decide whether to grant leave to amend. Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15... [is] to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citation omitted). Nonetheless, a district court may deny leave to amend a complaint due to "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *See Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008).

**B.      Discussion**

Shapiro asserts seven causes of action in his Counterclaim against Ponomarenko, and zero causes of action in his Third Party Complaint against Summit Estate. *See generally* Answer & Counterclaim. The Court finds that six of the causes of action against Ponomarenko, and the entire Third Party Complaint against Summit Estate, are insufficiently pled. Shapiro's pleading also contains general deficiencies, such as failure to state a demand for relief sought in the Counterclaim as required by Rule 8(a)(3), and failure to plead any causes of action against Summit Estate. In his opposition, Shapiro concedes that he "inadvertently omitted a prayer for relief at the conclusion of the Counterclaim," and then provides a prayer for relief in the text of his brief. *See* Opp'n to MTD at 15-16 ("Accordingly, the following [prayer for relief] should have been included.") This is improper, as the Court's review on a motion to dismiss is limited to the four corners of the complaint. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986). However, Shapiro is given leave to amend to address these deficiencies and may add his inadvertently omitted prayer for relief.

Shapiro uses his opposition to add allegations to the point where it looks like an entirely new claim. For example, Shapiro argues that he has a viable Third Party claim against Summit

Estate for Statutory Unfair Competition pursuant to California Business and Professional Code § 17200. *See* Opp'n to MTD at 14. Shapiro does not allege a § 17200 claim anywhere in his pleading, and he cannot amend his Counterclaim and Third Party Complaint through his opposition brief. Accordingly, Ponomarenko and Summit Estate's motion to dismiss any § 17200 claim is GRANTED WITH LEAVE TO AMEND.

To the extent that Shapiro wishes to rely on his "Statement of Relevant Facts" in his opposition, which are also absent from his Counterclaim, he must allege those facts in an amended pleading. The Court will not evaluate their sufficiency, but will consider them as Shapiro's offer of amendment. Any amendment must also distinguish between the causes of action and factual allegations brought against Ponomarenko, and those brought against Summit Estate.

### 1.      Claims against Summit Estate

The Third Party Complaint against Summit Estate also fails for lack of factual specificity. The Supreme Court has made clear that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Shapiro's allegations regarding Summit Estate are sparse. Shapiro alleges that Summit Estate and Ponomarenko "are alter egos of one another," based on the sole contention that Ponomarenko paid Shapiro for coaching services with a "corporate business check" from Summit Estate. *See* Answer & Counterclaim ¶¶ 21, 34.

Shapiro attempts to bolster his allegations through his opposition, and argues that the Third Party Complaint sufficiently alleges that Ponomarenko used Summit Estate as a "virtual ATM" for his own personal use in accomplishing his objectives and funding "Elevated Pickup." *See* Opp'n to MTD at 14-15, ECF 62. To the extent that this is Shapiro's theory, he does not allege it in the Third Party Complaint. The issue is compounded by the fact that the only factual allegations are contained in the Counterclaim, which is brought against Ponomarenko only. *See* Answer & Counterclaim at 19-24. The Court cannot make out a coherent theory of alter ego liability from Shapiro's pleading, and Summit Estate is not on notice of the claims against it or the factual basis for those claims. *See Twombly*, 550 U.S. at 556 n.3 ("Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.")

As pled, Shapiro has not adequately alleged any cognizable claims against Summit Estate. Moreover, a standalone allegation of a payment made from Summit Estate on Ponomarenko's behalf is insufficient to support an alter ego theory. Ponomarenko and Summit Estate's joint motion to dismiss the Third Party Complaint against Summit Estate is GRANTED WITH LEAVE TO AMEND.

### 2. Breach of Contract Claim against Ponomarenko

The Court next turns to the seven causes of action alleged in Shapiro's Counterclaim, which, as pled, are asserted against Ponomarenko only.[7] The Court finds that Shapiro's first cause of action for breach of contract is the only claim that survives this motion to dismiss. At the outset, it is unclear whether California or Nevada contract law applies to this claim in light of the pending transfer of this action to Nevada. Ponomarenko and Summit Estate argue that the first cause of action is insufficiently pled under California law. *See* MTD at 8. Shapiro does not point to a choice of law provision in the First Agreement, or provide any support for his breach of contract claim other than a recitation of Rule 8. *See* Opp'n to MTD at 10. Nevertheless, the Court finds that Shapiro has stated a claim for breach of contract under both California and Nevada law.

The elements of a claim for breach of contract under California law are: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011). "A written contract may be pleaded either by its terms—set out verbatim in the complaint or a copy of the contract attached to the complaint and incorporated therein by reference—or by its legal effect." *McKell v. Washington Mut., Inc.*, 142 Cal. App. 4th 1457, 1489 (2006). Similarly, a breach of contract claim under Nevada law requires "(1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of the breach." *Med. Providers Fin. Corp. II v. New Life Centers, L.L.C.,* 818 F.Supp.2d 1271, 1274 (D. Nev. 2011). Generally, a contract is valid and enforceable if there has been "an offer and acceptance, meeting of the minds, and consideration." *May v. Anderson,* 121 Nev. 668, 119 P.3d 1254, 1257 (2005).

---

[7] Shapiro may re-organize his pleading and supplement the factual basis for his claims if he wishes to allege these causes of action against Summit Estate.

10

Shapiro attaches the written contract to his Counterclaim, and Ponomarenko does not dispute its existence or enforceability.  As discussed further below, Ponomarenko seeks to enforce the same written contract through his own breach of contract claim against Shapiro in the FAC.  Ponomarenko's only argument is that Shapiro has not stated a breach of contract claim because "Ponomarenko had already fully paid Shapiro and/or PVM." MTD at 8-9.  Of course, the entire basis of Shapiro's breach of contract claim is that Ponomarenko did not pay in full, and still owes thousands of dollars under the contract.  *See* Answer & Counterclaim at 24 (alleging that Ponomarenko "failed to meet his financial obligations" resulting in at least $23,000 in damages to Shapiro).

At the motion to dismiss stage, the Court views these allegations in the light most favorable to Shapiro, and cannot credit Ponomarenko's insistence that he "fully performed his end of the bargain" by making payments to Krogh and Shapiro.  MTD at 9.  Ponomarenko's declaration and attorney argument on this point are misplaced on a Rule 12(b)(6) motion, and the Court STRIKES Ponomarenko's declaration attached to the motion to dismiss.  *See* ECF 59-1.  The motion to dismiss Shapiro's breach of contract claim against Ponomarenko is DENIED.[8]

### 3.    Breach of Confidentiality and Non-Compete Provisions

The factual allegations in the Counterclaim cannot support the remainder of Shapiro's causes of action.  With respect to his second and third causes of action for breach of confidentiality and breach of the non-compete provision in the written agreement, Shapiro merely identifies these provisions but does not adequately allege facts regarding Ponomarenko's conduct to make these claims for relief plausible.  *Iqbal*, 556 U.S. at 678 (A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").  Shapiro has not adequately identified any confidential information, or that Ponomarenko actually used any such proprietary information in violation of the non-disclosure agreement.  As Ponomarenko points out, Shapiro alleges "vaguely and without specifics" that

---

[8] Although any claims against Summit Estate are dismissed for the reasons discussed above, the Court also notes that Summit Estate did not sign the written agreement at issue.  In order to proceed on the breach of contract claim against Summit Estate, Shapiro must allege a valid theory of liability.

Ponomarenko contacted other unspecified clients and individuals in an effort to disclose confidential information that is not described in any detail in the Counterclaim. *See* MTD at 10 (quoting Answer & Counterclaim at 23). Without allegations of who Ponomarenko contacted and what information he disclosed, the Court cannot infer that he violated that First Agreement's non-disclosure provisions.

Regarding the non-compete provision and PVM's alleged competitor "Elevated Pickup," there are no factual allegations regarding when Ponomarenko started this competing entity. Indeed, Shapiro contends that "the exact dates are yet unknown." Answer & Counterclaim at 22. Therefore, Shapiro has not plausibly alleged that Ponomarenko violated the non-compete provision which by its terms only applied for "a period of two years." *See* First Agreement at 10. The other allegations in the Counterclaim are conclusory, asserting that Ponomarenko "breached" the non-compete provision in unspecified ways, which constituted "unfair competition" resulting in unspecified "damages" to Shapiro. Answer & Counterclaim at 26-27.

The Court need not credit these conclusory allegations. *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (holding that on a motion to dismiss the Court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") Because the third cause of action for breach of the non-compete provision fails for lack of factual specificity, the Court does not reach Ponomarenko's argument that non-compete clauses are generally unenforceable under California law. *See* MTD at 11. Thus, even if Shapiro amends his factual allegations, his claim for breach of the non-compete provision may ultimately hinge on whether the transferee court determines that California or Nevada law applies to the contract claims. *See* Cal. Bus. & Prof. Code § 16600.[9]

For the foregoing reasons, the motion to dismiss Shapiro's second and third causes of action for breach of non-disclosure, confidentiality, and non-compete provisions in the written agreement is hereby GRANTED WITH LEAVE TO AMEND.

---

[9] The Court further notes that this is not an employment agreement, and makes no determination regarding whether § 16600 applies to this business relationship between the parties.

### 4. Tortious Interference with Prospective Economic Advantage

Ponomarenko argues that Shapiro has failed to sufficiently state a claim for intentional interference with prospective economic advantage. MTD at 11-12. The parties agree that California law applies to this claim. *Compare* MTD at 11-12 *with* Opp'n to MTD at 11-12. The elements of a claim for tortious interference with prospective economic advantage are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003).

In contrast to a claim for intentional interference with an existing contract, which is "a wrong in and of itself," intentionally interfering with another party's prospective economic advantage is not inherently wrongful. *See Korea Supply Co.*, 29 Cal. 4th at 1158. "To establish a claim for interference with prospective economic advantage, therefore, a [complainant] must plead that the defendant engaged in an independently wrongful act." *Id.* (citing *Della Penna, supra,* 11 Cal.4th at p. 393, 45 Cal.Rptr.2d 436, 902 P.2d 740.) An act is not independently wrongful merely because defendant acted with an improper motive. *Id.* Rather, an act is independently wrongful only if it is "unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Id.* at 1159.

It is not clear what unlawful interference Shapiro alleges against Ponomarenko. Once again, Shapiro's opposition does not clarify his allegations. Shapiro only recites the elements of the cause of action and then relies on Rule 8 and a "Statement of Relevant Facts" which are not pled in his Counterclaim. *See* Opp'n to MTD at 11-12. To the extent that Shapiro alleges that Ponomarenko interfered with his own contract, such a claim is not plausible. The factual allegations also do not plausibly allege that Ponomarenko interfered with Shapiro's contracts or economic relationships with unnamed "customers and merchants." Answer & Counterclaim at 27-28. Nor does the Counterclaim allege any "unlawful" acts by Ponomarenko to support a claim for tortious interference with prospective economic advantage. *Korea Supply Co.*, 29 Cal. 4th at

1159.  Ponomarenko's motion to dismiss Shapiro's fourth cause of action is GRANTED WITH
LEAVE TO AMEND.

### 5.    Violation of Nevada Uniform Deceptive Trade Practices Act

In his fifth cause of action against Ponomarenko, Shapiro alleges that Ponomarenko
knowingly made false representations in violation of the Nevada Uniform Deceptive Trade
Practices Act ("NDTPA"), NRS 598.0915.  *See* Answer & Counterclaim at 28-29.  Specifically,
Shapiro references NRS 598.0915(2), 598.0915(8), and 598.0915(15). *Id.*  These provisions
provide that it is a deceptive trade practice under Nevada law to "[k]nowingly make[] a false
representation as to the source, sponsorship, approval or certification of goods or services for sale
or lease;" to "[d]isparage[] the goods, services or business of another person by false or misleading
representation of fact;" and to "[k]nowingly make[] any other false representation in a
transaction." NRS 598.0915(2), (8), (15).

The Court agrees with Ponomarenko that this claim involves false representations and is an
averment of fraud.  Thus, the heightened pleading standard of Rule 9(b) applies.  Shapiro "must
state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b)
"Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."
Rule 9(b) requires a plaintiff to be "specific enough to give defendants notice of the particular
misconduct which is alleged to constitute the fraud charged so that they can defend against the
charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d
756, 764 (9th Cir. 2007) (internal quotation marks and citation omitted).  "Averments of fraud
must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Vess
v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quoting *Cooper v. Pickett*, 137
F.3d 616, 627 (9th Cir. 1997).

Shapiro does not provide any factual allegations to support a claim under any provision
of § 598.0915.  The Counterclaim is devoid of facts regarding the "who, what, when, where, and
how" of the alleged misrepresentations.  Shapiro does not even identify the transaction or
misrepresentation at issue, let alone explain why the statement or omission complained of was
false or misleading.  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1548.  Shapiro's vague factual

allegations and recitation of the elements of the Nevada Statute are insufficient to meet the requirements of Rule 9(b), or even the pleading standards set forth in *Iqbal* and *Twombly*. There are no facts regarding the content, time, place, or parties involved in Ponomarenko's allegedly disparaging or false representations of fact. The motion to dismiss Shapiro's fifth cause of action for a violation of the NDTPA is GRANTED WITH LEAVE TO AMEND if Shapiro can allege facts showing that Ponomarenko (or Summit Estate on a properly alleged theory of liability) violated the NDTPA.

### 6. Civil Conspiracy

Shapiro alleges that Ponomarenko engaged in a civil conspiracy with Krogh "to illegally misappropriate [Shapiro's] intellectual property, business models and clients." Answer & Counterclaim at 29. To state a cause of action for conspiracy, Shapiro must plead three elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct. *See, e.g., Craigslist, Inc. v. 3Taps Inc.,* 942 F.Supp.2d 962, 981 (N.D.Cal.2013) (noting that the first element itself has three subparts: "(i) knowledge of wrongful activity, (ii) agreement to join in the wrongful activity, and (iii) intent to aid in the wrongful activity"). Further, civil conspiracy claims are subject to a heightened pleading standard, demanding that a plaintiff allege specific facts "containing evidence of unlawful intent, or face dismissal of the claim." *Buckey v. Cnty. of Los Angeles,* 968 F.2d 791, 794 (9th Cir. 1992).

Having reviewed the entirety of Shapiro's Counterclaim, the Court is unable to piece together specific factual allegations that could state a claim for civil conspiracy. There is no alleged "meeting of the minds" between Ponomarenko and Krogh, or even any facts regarding actions either of these individuals took in furtherance of the conspiracy. The Court cannot determine from Shapiro's allegations how the conspiracy formed or operated, and whether Ponomarenko had knowledge of or intent to aid in wrongful activity, or even what the alleged wrongful activity entailed. Cursory allegations that Ponomarenko contacted PVM students and agents to solicit business and prospective clients for "Elevated Pickup" is insufficient to state a claim for civil conspiracy. Shapiro's conclusory remarks that Ponomarenko and Krogh "engaged

in a civil conspiracy" and "agreed with one another to engage in a fraud that violated state and federal statutory and common law," are insufficient to provide notice to Ponomarenko and Summit Estate of their conduct giving rise to a conspiracy claim. *See* Answer & Counterclaim at 29. Such a failure to plead any specific allegations demands that the conspiracy claim be dismissed. *See Buckey,* 968 F.2d at 794.

Because Shapiro proceeds *pro se* and his civil conspiracy claim could feasibly be cured through amendment, the motion to dismiss Shapiro's sixth cause of action for civil conspiracy is GRANTED WITH LEAVE TO AMEND. However, Shapiro is cautioned that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to meet Rule 8's pleading requirements]." *Iqbal,* 556 U.S. at 678.

### 7. Breach of Implied Covenant of Good Faith and Fair Dealing

Ponomarenko and Summit Estate argue that Shapiro's seventh cause of action for breach of the implied covenant of good faith and fair dealing should be dismissed because it is duplicative of his breach of contract claim. *See* MTD at 16. The parties appear to dispute what law applies, although Shapiro cites both California and Nevada law in support of his claim. *See* Opp'n to MTD at 13. California and Nevada law both provide that every contract contains a covenant of good faith and fair dealing. *See A.C. Shaw Const., Inc. v. Washoe Cty.*, 105 Nev. 913, 914 (1989) ("[W]e have previously recognized that an implied covenant of good faith and fair dealing exists in *all* contracts.") (emphasis in original); *see also Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 683 (1988) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.")

Shapiro contends that Ponomarenko breached the implied covenant by acting in bad faith on "multiple instances" and dealing unfairly with regard to his contract with PVM, which somehow supports tort liability. *See* Opp'n to MTD at 13 (citing *Hilton Hotels Corporation v. Butch Lewis Productions, Inc.*, 862 P.2d 1207, 109 Nev. 1043, 1046-47 (1993)). As discussed above, the allegations regarding Ponomarenko's dealings with Krogh are vague and conclusory. As pled, they do not support an inference that Ponomarenko is liable for tortious conduct separate and apart from his contractual liability. *See Iqbal*, 556 U.S. at 678 (holding that a claim is facially

United States District Court
Northern District of California

plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.")  Although the Court need not credit Ponomarenko's declaration, which has been stricken, the allegations in the Counterclaim are deficient with respect to Shapiro's seventh cause of action.  As such, Ponomarenko's motion to dismiss the breach of implied covenant of good faith and fair dealing is GRANTED WITH LEAVE TO AMEND.

For the foregoing reasons, Ponomarenko and Summit Estate's joint motion to dismiss Shapiro's Counterclaim and Third Party Complaint is GRANTED IN PART WITH LEAVE TO AMEND and DENIED IN PART.  The motion to dismiss Shapiro's first cause of action for breach of contract against Ponomarenko is DENIED.  The remainder of the claims against Ponomarenko, and all claims against Summit Estate, are DISMISSED WITH LEAVE TO AMEND.

Shapiro may attempt to plead specific allegations as to Ponomarenko and Summit Estate consistent with the Court's comments above. *See Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995) (per curiam) ("Unless it is absolutely clear that no amendment can cure the defect, however, a pro se litigant is entitled to notice of the complaint's deficiencies and an opportunity to amend prior to dismissal of the action.").  Although the Court is giving Shapiro leave to amend, he may not add new causes of actions or parties without leave of court.

### III.    MOTION TO TRANSFER

Turning to Shapiro's motion to change venue, the Court determines that transfer of this case to the District of Nevada is appropriate, and hereby GRANTS Shapiro's motion to change venue pursuant to § 1404(a) and the forum selection clause in the First Agreement.

#### A.    Legal Standard

#### 1.    Traditional § 1404(a) Transfer Analysis

A district court may, in the interest of justice, transfer any civil action "to any other district or division where it might have been brought" for the convenience of the parties and of the witnesses.  28 U.S.C. § 1404(a).  To determine if a transfer of venue is appropriate under § 1404(a), courts apply a two-part test. *Ctr. For Biological Diversity v. McCarthy*, No. 14-cv-5138, 2015 WL 1535594, at *1 (N.D. Cal. Apr. 6, 2015) (citing *Hatch v. Reliance Ins. Co.*, 758

F.2d 409 (9th Cir. 1985)).  First, courts consider whether the case could have been brought in the proposed transferee district.  *Id.*  Second, if the case could have been brought in the transferee district, courts determine if the case should be moved to that forum "for convenience of parties and witnesses [and] in the interest of justice." *McCarthy*, 2015 WL 1535594, at *1; 28 U.S.C. § 1404(a).

In determining the interest of justice under the traditional § 1404(a) analysis, courts consider a wide variety of factors.  *Dillon v. Murphy & Hourihane, LLP*, No. 14- CV-01908, 2014 WL 5409040, at *13 (N.D. Cal. Oct. 22, 2014).  In particular, the Ninth Circuit explained that courts may consider: (1) the location where the relevant agreements were negotiated and executed, (2) the state that is most familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof. *Id.* (quoting *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000)).

"No single factor is dispositive, and a district court has broad discretion to adjudicate motions for transfer on a case-by-case basis." *Ctr. for Biological Diversity v. Kempthorne*, No. 08- 1339, 2008 WL 4543043 (N.D. Cal. Oct. 10, 2008) (citation omitted).  "The burden is on the party seeking transfer to show that when these factors are applied, the balance of convenience clearly favors transfer." *Lax v. Toyota Motor Corp.*, 65 F. Supp. 3d 772, 776 (N.D. Cal. 2014) (citing *Commodity Futures Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979)).

### 2. The Effect of a Valid Forum Selection Clause on Traditional Transfer Analysis

The multifactor private-public interest analysis changes dramatically when the parties to an action have agreed to a valid forum selection clause.  In *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for W. Dist. Of Tex.*, the Supreme Court made clear that a forum selection clause "may be enforced through a motion to transfer under § 1404(a)," and clarified its effect on the traditional § 1404(a) analysis. 134 S.Ct. 568, 579, 581 (2013).  Rather than evaluating both the private

interests of the parties and public interest considerations, a district court considering a motion to transfer when the parties' agreement contains a valid forum-selection clause must consider that clause to represent the parties' "agreement as to the most proper forum" and should give the clause "controlling weight in all but the most exceptional cases." *Id.*

More specifically, where a valid forum selection clause preselects a different forum than the one selected by the plaintiff, the § 1404(a) analysis is altered in three ways: (1) the plaintiff's choice of forum "merits no weight," and the burden shifts to the plaintiff to show why the action should not be transferred to the preselected forum; (2) the court "must deem the private-interest factors to weigh entirely in favor of the preselected forum"; and (3) a § 1404(a) transfer of venue "will not carry with it the original venue's choice-of-law rules." *Id.* at 582. Although the defendant generally carries the heavy burden on a traditional motion to transfer under § 1404(a), when an agreement contains a valid forum selection clause it is the plaintiff's burden to show either that the forum selection clause is not valid, or that the public interest factors to be considered under § 1404(a) make transfer inappropriate. *Id.* at 579, 582. However, where the forum selection clause does not cover the parties' dispute, the burden of showing why transfer is warranted remains with the defendant, and the Court must evaluate the motion to change venue under the normal § 1404(a) framework. *See Jones*, 211 F.3d at 499; *Atl. Marine*, 134 S.Ct. at 582. *See also Ryan v. Microsoft* at *6.

### B.  Discussion

#### 1.  Jurisdiction and Venue in Clark County, Nevada

In his motion to change venue pursuant to § 1404(a), Shapiro contends that his contract with Ponomarenko contains a valid forum selection clause that requires Ponomarenko to litigate the instant action in Las Vegas, Nevada. *See generally* Transfer Mot.; Transfer Reply at 7-8, ECF 76. As a threshold matter under § 1404(a), this Court must determine whether the instant action could have been brought in the proposed transferee district—the District of Nevada seated in Las Vegas, Clark County. *See McCarthy*, 2015 WL 1535594, at *1. To find that the action could have been brought in the transferee district, the Court must be satisfied that the transferee district has personal jurisdiction over all of the Defendants and that venue would be proper in that District.

The parties do not dispute that this action could have been brought against Defendants in the U.S. District Court for the District of Nevada seated in Las Vegas, Clark County. *See generally* Opp'n to Transfer, ECF 75.[10] Ponomarenko and Summit Estate do argue, however, that Shapiro's inclusion of Summit Estate in the Third Party Complaint further undermines Shapiro's argument for transfer under § 1404(a) of this action because Summit Estate "has not consented to the transfer to another district and was never party to any contract that bound it to venue." Opp'n to Transfer at 6. As discussed above, Shapiro proceeds on an "alter ego" theory against Summit Estate, and the Court has dismissed all claims against Summit Estate with leave to amend. In order for Shapiro to allege that Summit Estate acted as Ponomarenko's alter ego, he will necessarily have to allege that Summit Estate is liable with respect to the First Agreement between Ponomarenko and PVM and thus subject to the contract's jurisdiction and venue provisions.

Accordingly, and in light of the allegations in the pleadings, the Court is satisfied that this action could have been brought in the District of Nevada seated in Las Vegas, Clark County.

### 2.    Validity of the Forum Selection Clause

The Court next considers the applicable § 1404(a) analysis, and must determine whether the forum selection clause at issue is valid and enforceable. This is because the *Atlantic Marine* analysis "presupposes a contractually valid forum-selection clause." 134 S.Ct. at 581. Otherwise, the Court evaluates the traditional § 1404(a) factors. The forum selection clause in the First Agreement provides in full:

> Venue: All actions or proceedings arising in connection with this Agreement shall be tried and litigated exclusively in Clark County, Nevada State and Federal Courts. This choice of venue is mandatory and not permissive, thereby precluding the possibility of litigation between the parties with respect to or arising out of this Agreement, in any venue other than that specified in this paragraph. Each party waives any right they may have to assert the doctrine of forum non conveniens or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this paragraph. This agreement as to venue is based upon the following:
>
> > i.   95% of coaching is conducted in Clark County, Las Vegas, Nevada.
> > ii.  PVM is located in Las Vegas, Nevada.

---

[10] In other words, Ponomarenko and Summit Estate do not challenge personal jurisdiction over Ponomarenko, Shapiro, or PVM in Nevada, nor do they assert that Nevada is an improper venue under 28 U.S.C. § 1391(b). *See generally* Opp'n to Transfer.

First Agreement, Section XII, ¶ 2, at 12.

Ponomarenko challenges the validity of the forum selection clause on various grounds, including (1) waiver; (2) ambiguity; and (3) that the forum selection clause is not binding because it is part of a disputed contract. *See* Opp'n at 2-5. "A forum selection clause is presumptively valid." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972); *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1083 (9th Cir. 2009). A party challenging the clause bears a "heavy burden of proof" and must "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.* The Court finds that the forum selection clause is valid.

At the outset, Ponomarenko contends that Shapiro failed to assert improper forum in California by filing an answer before filing any motion for "improper venue," which constitutes a waiver of his right to challenge Ponomarenko's venue selection. *See* Opp'n to Transfer at 4. This argument fails for several reasons. Shapiro is proceeding *pro se* and the Court is mindful that pleadings by *pro se* litigants are held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Nevertheless, in his Answer, Counterclaim and Third Party Complaint, Shapiro clearly denied Ponomarenko's choice of venue in California, and affirmatively asserted venue in Nevada pursuant to the forum selection clause. *See* Counterclaims ¶ 9 ("Answering the allegations set forth in paragraph 9 of Plaintiff's First Amended Complaint on file herein, this Answering Defendant-Counterclaimant denies the same, and each and every part thereof. Plaintiff has incorrectly and inappropriately cited 28 U.S.C. 1391(a) as a basis for Venue in this Court."); *see also id*. ¶ 5 at 19 ("Venue is proper in the United States District Court of Nevada seated in Clark County, Las Vegas, Nevada pursuant to 28 U.S.C. 1391(b)(1); further, pursuant to the Agreement Counterdefendant contractually submitted to both mandatory personal jurisdiction and venue in Clark County, Nevada.") (citing *Atlantic Marine*,

134 S.Ct. 568); *id.* ¶ 5 at 31 (same). [11]

More importantly, *Atlantic Marine* explicitly rejects Ponomarenko's contention that Shapiro was required to challenge Ponomarenko's choice of venue as "improper" in order to enforce the forum selection clause. 134 S.Ct. at 579. The Supreme Court concluded that venue is proper "so long as the requirements of § 1391(b) are met, irrespective of any forum-selection clause." *Id.* at 578. "Although a forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of § 1406(a) or Rule 12(b)(3), the clause may be enforced through a motion to transfer under § 1404(a)." *Id.* Thus, it actually would have been *inappropriate* under Supreme Court precedent for Shapiro to file a motion to dismiss or otherwise challenge venue as improper, and he has not waived his right to enforce the forum selection clause through a § 1404(a) motion. For these reasons, Ponomarenko not only had ample notice that Shapiro sought to enforce the forum selection clause in Nevada, but *Atlantic Marine* actually holds that Shapiro's § 1404(a) is the proper method to enforce it.

With respect to the language of the forum selection clause, Ponomarenko argues that the clause is invalid or "defective" because it fails to specify in which Federal Courts a cause of action could be filed. *See* Opp'n at 4-5. To the contrary, the clause is extremely clear. In relevant part, the parties agreed that: "[a]ll actions or proceedings in connection with this Agreement shall be tried and litigated exclusively in Clark County, Nevada State and Federal Courts." First Agreement Section XII, ¶ 2, at 12. Ponomarenko argues that the clause is ambiguous because an action could be filed in either state or federal court in Clark County, Nevada. *See* Opp'n at 5. Without citing to any authority in support of his position, Ponomarenko contends that it is "customary for binding venue clauses" to state that the action must be brought in federal court. *Id.*

This argument is easily disposed of. Similar language in forum selection clauses drafted by the internet search giant, Google, have been upheld by district courts around the country who transfer the cases to Santa Clara, California. For example, the District of Massachusetts enforced a forum selection clause in Google's Terms of Service that provided: "All claims arising out of or

---

[11] Shapiro also points out that he *did* move to change venue prior to filing his Answer, but withdrew the motion "specifically without prejudice to re-file the said Motion." ECF 52.

relating to these terms or the Services will be litigated exclusively *in the federal or state courts of Santa Clara County*, California, USA, and you and Google consent to personal jurisdiction in those courts." *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1107 (N.D. Cal. 2016) (emphasis added). The forum selection clause in the First Agreement is unambiguous and legally indistinguishable. Here, the District of Nevada has two courthouses, one of which is located in Las Vegas, Clark County, Nevada. Ponomarenko's argument that the forum selection clause is ambiguous is unpersuasive.

Moreover, Ponomarenko is a sophisticated individual who actually made copious notes and changes to the First Agreement before he signed it, as well as initialed every page of the contract including the page containing the forum selection clause. *See generally* First Agreement. Unlike consumers or customers clicking "accept" when presented with a company's standard Terms of Service, this case involves an agreement between sophisticated parties who exercised their ability to negotiate certain provisions of the contract, as evidenced by Ponomarenko's handwritten interlineations. This provides even more support for upholding the validity of the forum selection clause in the First Agreement.

The Court also rejects Ponomarenko's primary argument that the forum selection clause is "not binding" because it is part of a disputed contract. In their opposition, Ponomarenko contends that because he alleges that the entire contract was fraudulent, invalid, or otherwise uncertain, he cannot be deemed to have consented to a forum selection clause within such contract. *See* Opp'n to Transfer at 3. The Court takes issue with Ponomarenko's characterization of the facts of this case. The First Agreement is not "in dispute" in this action. To the contrary, the FAC does not challenge the validity of the First Agreement, the forum selection clause, or the Second Agreement for that matter. In fact, Ponomarenko actually seeks to recover damages for Shapiro's breach of the First Agreement. *See* FAC ¶¶ 44-50.

Ponomarenko cannot have it both ways by alleging that he has been harmed by Defendants' "failure to perform" the First Agreement, FAC ¶ 50, and also challenging the Agreement as fraudulent, invalid, or otherwise uncertain for purposes of invalidating the forum selection clause. All six causes of action in the FAC actually rely on the existence of a valid

agreement between the parties. Even Ponomarenko's misrepresentation claims allege that "Defendants represented to Plaintiff that Defendants would perform coaching services to Plaintiff as set forth in the First and Second Agreement." *Id*. ¶¶ 52, 60. Indeed, Ponomarenko describes this case as being "about a breach of contract and fraud in which Plaintiff Paul Ponomarenko was promised life and motivational coaching services but was never provided such services by the Defendants." *See* MTD at 1. Ponomarenko does not seek to void the contract as unenforceable, and his arguments aimed at the validity of the forum selection clause fail on these grounds as well.

### 3. Whether *Atlantic Marine* Governs the § 1404(a) Analysis

Ponomarenko and Summit Estate argue that even if the forum selection clause is valid, the § 1404(a) analysis would not support transfer to Nevada. *See* Opp'n to Transfer at 5. Ponomarenko points to the FAC, which he argues includes several claims that are "wholly unrelated" to the First Agreement containing the forum selection clause, including breach of the oral Second Agreement that is entirely separate from the First Agreement. *See* FAC ¶¶ 26-30, 51-74. Thus, their argument is that the forum selection clause only covers Ponomarenko's claims relating to the First Agreement. Opp'n to Transfer at 6. However, even if the terms of the alleged Second Agreement are sufficiently pled, the Court finds that the First Agreement is the primary contract between the parties and contains a valid forum selection clause. Moreover, the First Agreement contains a provision stating that all changes must be in writing, and an integration clause providing that the written agreement contains "the entire agreement between the parties" and "[n]o subsequent agreement, representation or promise made by either party, or by or to any employee, officer, agent or representative of either party shall be of any effect unless it is in writing and executed by the parties to be bound." *See* Transfer Mot. at 3; First Agreement at 13.

The Second Agreement is purported to be just that—an agreement proposed by an agent of PVM (Krogh), to provide additional coaching sessions in California. FAC ¶ 26. Ponomarenko specifically alleges that he "was informed and led to believe that this second agreement was authorized by Defendant PVM, and no communications were made by Defendant Shapiro at that time to the contrary." *Id*. Even the payments made to Krogh in February 2014 were made pursuant to both the First Agreement and Second Agreement, demonstrating that the oral

1   agreement appears to be an extension of the written agreement for personal coaching services

2   governing the relationship between the parties . *Id*. ¶ 28.  The Court anticipates a factual dispute as

3   to the existence of the Second Agreement, and whether the forum selection clause and non-

4   disclosure provisions of the First Agreement extend to that contract.  However, Ponomarenko has

5   failed to demonstrate that the forum selection clause does not extend to certain claims in the FAC.

6       The Court agrees with Shapiro that *Atlantic Marine* applies to this case, and mandates

7   adjustments to the traditional § 1404(a) analysis.  At the hearing, Ponomarenko and Summit Estate

8   insisted that *Atlantic Marine* cannot decide this case because the forum selection clause does not

9   apply to all of their claims.  They also argued that *Atlantic Marine* provides that the forum

10  selection clause should only be considered as one factor in the § 1404(a) analysis.  However,

11  Ponomarenko and Summit Estate cite no authority for their proposed analysis, other than an

12  outdated legal standard from a pre-*Atlantic Marine* case that has since been clarified by the

13  Supreme Court. Opp'n to Transfer at 7 (arguing that the Court should give a forum selection

14  clause "neither dispositive consideration… nor no consideration…but rather the consideration for

15  which Congress provided in § 1404(a).") (citing *Stewart Org., Inc. v. Ricoh Corp.,* 108 S.Ct. 2239,

16  2245 (1988)); *see also id.* at 8 ("[D]espite Defendant's reliance on *Atlantic,* the language of

17  § 1404(a) is permissive, rather than directive; as the *Stewart* court stated, a forum-selection clause

18  is not a single dispositive factor as to whether transfer is appropriate in §1404(a)).  The Court

19  finds that Ponomarenko and Summit Estate have misread *Atlantic Marine*, and disagrees with their

20  analysis.

21      The Court also finds that the forum selection clause covers the claims in the FAC.

22  Although the Court indicated at the hearing that it was leaning toward keeping the case in

23  California, the Court cannot ignore the clear and broad forum selection clause in the written

24  agreement between the parties, and the guidance from the Supreme Court in *Atlantic Marine*.  It is

25  clear from a plain reading of the forum selection clause that it applies to Ponomarenko's claims

26  against Shapiro and PVM.  Ponomarenko's claims, even those involving the alleged oral

27  agreement, fall within the ambit of the written agreement for personal coaching services which

28  provides that "[a]ll actions or proceedings *arising in connection with* this Agreement shall be tried

and litigated exclusively in Clark County, Nevada State and Federal Courts." First Agreement at 12 (emphasis added). This clause is mandatory, and its breadth supports this Court's finding that this entire action arises "in connection with" the First Agreement. Accordingly, *Atlantic Marine* dictates that the Court should transfer this action to the District of Nevada pursuant to § 1404(a) absent exceptional circumstances. 134 S.Ct. at 581 ("a valid forum selection clause should be given controlling weight in all but the most exceptional cases.")

Under *Atlantic Marine*, Ponomarenko's choice of venue in California "merits no weight," and the burden shifts to Ponomarenko to show why the action should not be transferred to the preselected forum. *Id.* at 582. In addition, the Court must ignore Ponomarenko and Summit Estate's arguments regarding private interest factors, such as their assertion that "the majority of events, witnesses, and parties are located in California." Opp'n to Transfer at 7. This is because when a valid forum selection clause covers a parties' dispute, the Court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." 134 S.Ct. at 582. This is because the forum selection clause waives the parties' "right to challenge the preselected forum as inconvenient" and the "district court may consider arguments about public-interest factors only." *Id.* at 582. Ponomarenko agreed to litigate disputes "arising in connection" with the First Agreement in Las Vegas, Nevada, and his traditional § 1404(a) arguments that the convenience of the parties and witnesses and the interests of justice weigh in favor of venue in California are simply irrelevant under *Atlantic Marine*. In other words, where there is a valid forum selection clause in a contract between the parties, "the interest of justice" is best served by giving effect to the parties' bargain. *Id.* at 581.[12]

In the face of a valid and enforceable forum selection clause, Ponomarenko and Summit Estate can only avoid transfer pursuant to the forum selection clause by demonstrating that the public interest under § 1404(a) makes transfer inappropriate. *Id.* at 579, 582. At the hearing and in their briefing, Ponomarenko and Summit Estate put forth no persuasive public interest arguments,

---

[12] Although it need not undergo a traditional § 1404(a) analysis in this case, it is likely that the Court would exercise its discretion to transfer the case to Las Vegas, Nevada, in light of the public and private interests weighing in favor of that forum, where the First Agreement was executed.

other than those rejected above such as that Shapiro should not be able to enforce any term of a disputed contract.  Again, the First Agreement is not disputed, as Ponomarenko seeks to enforce it in his FAC.  The Court finds that Ponomarenko and Summit Estate have failed to raise any exceptional circumstances or public interest factors that preclude enforcement of the forum selection clause. *Atlantic Marine*, 134 S.Ct. at 581; *see also T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 868 (N.D. Cal. 2015).

Finally, Shapiro's inclusion of Summit Estate in his Third Party Complaint does not render the forum selection clause unenforceable.  As discussed above, Shapiro has failed to plead any cause of action against Summit Estate, and must amend his alter ego allegations in order to proceed.[13]  Despite Ponomarenko's emphasis on an alleged oral agreement, this is not an exceptional case where a valid choice of venue clause is unenforceable.  Shapiro's motion to change venue pursuant to § 1404(a) is GRANTED.

## IV.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1.    Ponomarenko and Summit Estate's joint motion to dismiss Shapiro's Counterclaims and Third Party Complaint is GRANTED IN PART WITH LEAVE TO AMEND and DENIED IN PART.

2.    Shapiro may file an Amended Counterclaim and Third Party Complaint **on or before March 7, 2018.**[14]  Failure to meet the deadline to file an amended pleading or failure to cure the deficiencies identified in this Order may

---

[13] Although neither party cites to the relevant law, the Court is aware of out of circuit authority regarding whether the *Atlantic Marine* framework supplants the traditional transfer of venue analysis under § 1404(a) where some but not all parties to the action have agreed to a valid forum selection clause. *See In re: Howmedica Osteonics Corp*, 867 F.3d 390, 403 (3d Cir. 2017) (establishing, as a matter of first impression, four-step inquiry to evaluate forum selection clause applicable to some, but not all, parties) (cert. petition filed January 8, 2018).  In this case, the Court need not depart from *Atlantic Marine* because Summit Estate is not a separate "non-contracting" entity, but rather is alleged to be the alter ego of Ponomarenko, the contracting party.
[14] In providing thirty (30) days for amendment, the Court has already taken into account the amount of time required to administratively transfer the action.  A deadline of March 7, 2018 for Shapiro's amendment in the transferee court is reasonable, particularly in light of this Court's guidance to Shapiro regarding his pleading deficiencies at the December 7, 2017 hearing.

result in dismissal of Shapiro's claims with prejudice.

3.     Shapiro's motion to change venue to the District of Nevada, unofficial southern division seated in Las Vegas, Clark County, Nevada is GRANTED pursuant to the forum selection clause and § 1404(a).

4.     The Clerk of Court shall TRANSFER this entire action to the United States District Court for the District of Nevada in Las Vegas. Upon transfer of this action, the Clerk shall close the file in this District.

Dated: February 5, 2018

_____
BETH LABSON FREEMAN
United States District Judge